IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DANIEL GARY APPLEGATE**, | Case No. 3:23-cv-1368-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **R. BAINES** and **I. LOPEZ MENDOZA**, | |
| Defendants. | |

**Michael H. Simon, District Judge.**

Plaintiff Daniel Applegate, representing himself, sues Multnomah County Sheriff's Office ("MCSO") deputies R. Baines and I. Lopez Mendoza.[1] Plaintiff brings these claims against Defendants under 42 U.S.C. § 1983. He alleges that on August 27, 2023, Defendants violated the Eighth Amendment by subjecting Plaintiff to an unconstitutional strip search.

---

[1] Plaintiff does not explicitly state whether he sues Defendants in their individual capacities or in their official capacities as state officials. When a complaint does not state clearly whether a plaintiff sues a defendant in their individual or official capacity, and the plaintiff seeks damages, there is a strong presumption in favor of construing the pleading as an individual-capacity suit, because an official-capacity suit for damages would be barred. *See, e.g.*, *Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999); *Shoshone-Bannock Tribes v. Fish & Game Comm'n, Idaho*, 42 F.3d 1278, 1284 (9th Cir. 1994). Because Plaintiff seeks only damages, the Court construes Plaintiff's complaint as suing Defendants in their individual capacities.

PAGE 1 – OPINION AND ORDER

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed below, the Court denies Defendants' motion for summary judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

Courts must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the

PAGE 2 – OPINION AND ORDER

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

A court must liberally construe the filings of a self-represented, or *pro se*, plaintiff and afford the plaintiff the benefit of any reasonable doubt. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). The Ninth Circuit further instructs that "an ordinary *pro se* litigant, like other litigants, must comply strictly with the summary judgment rules. *Pro se* inmates are, however, expressly exempted from this rule." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (citation omitted). For a *pro se* inmate, courts "should avoid applying summary judgment rules strictly." *Id.* "This rule exempts *pro se* inmates from *strict* compliance with the summary judgment rules, but it does not exempt them from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (emphasis in original). The exception for *pro se* inmates does "not entirely release [an inmate] from any obligation to identify or submit some competent evidence supporting his claim." *Id.*

## BACKGROUND

### A. Plaintiff's Encounter with Defendants

At the time of the incident giving rise to this case, Plaintiff was a pretrial detainee[2] at the Multnomah County Detention Center. On August 27, 2023, Plaintiff resided in cell 4C07.

---

[2] Defendants indicate that Plaintiff was a pretrial detainee at the relevant time—and not already convicted—in their motion for summary judgment. ECF 20 at 8-11. As discussed below, whether a plaintiff is a pretrial detainee or a convicted adult in custody determines the proper constitutional analysis by which to evaluate that individual's claims. Because nothing in the

PAGE 3 – OPINION AND ORDER

ECF 22 at 21. At 7:30 AM that morning, Defendant Baines, the area sergeant on duty, was delivering breakfast to adults in custody living on the fourth floor. *Id.* at 21. Baines stopped at cell 4C07 and offered Plaintiff hot coffee, which Plaintiff accepted through the food port. *Id.* As Baines prepared to move to the next cell, Plaintiff threw the coffee on him through the food port. *Id.*; *id.* at 13. Baines then shut the food port with his foot. *Id.* at 21. Baines states that Plaintiff laughed and said "gotcha." *Id.*

After this incident, Baines decided to move Plaintiff from the 4C block to 4F, a disciplinary block. *Id.* "Due to Applegate's history of staff assaults," Baines recruited multiple deputies for the move to "help mitigate any issues that could arise and ultimately prevent injury to staff or Applegate." ECF 22 at 10. Baines, Lopez Mendoza, and three other deputies approached cell 4C07 to move Plaintiff, *id.* at 6, 10. During the walk to 4F, Plaintiff "appeared to be cooperating" and walking "quietly" and "without any issues." *Id.* at 10, 13.

Once inside cell 4F15, however, the encounter escalated. The parties dispute the details of what happened next. Plaintiff states:

> As I walked in the cell, they threw me face down on the floor and while I'm in handcuffs[,] Deputy R. Baines punched me in the left side of my face 6 times, after grabbing my glasses off my face and bending and disfiguring them. After Baines assaulted me, Lopez Mendoza slapped me in the right side of my face and he said to me "I slapped you." After they assaulted me they cut my clothes off [and] left me naked.

ECF 1 at 3.[3]

---

record suggests the contrary, nor does Plaintiff dispute this statement, the Court accepts that Plaintiff was in pretrial detention on August 27, 2023.

[3] Plaintiff provides this description of the encounter in his verified complaint. "[A] verified complaint may serve as an affidavit for purposes of summary judgment if it is based on personal knowledge and if it sets forth the requisite facts with specificity." *Moran v. Selig*, 447 F.3d 748, 759 n.16 (9th Cir. 2006).

PAGE 4 – OPINION AND ORDER

Defendants offer a different explanation of what happened. Baines's incident report states:

> As we entered the cell, Applegate began to push his body backwards towards myself and the other escort. I helped Applegate to the prone position on his mattress with the assistance from another deputy. I was holding the right arm and shoulder of Applegate with my left hand while deputies removed his pants. When bracing myself with my right hand on the mattress while the pants were being removed, Applegate turned his head and inched towards my hand attempting to bite me. I quickly moved my hand and placed it on the right side of Applegate's cheek and side of his forehead, holding his head against the mattress to prevent him from biting myself or other staff until his clothing was removed. Once Applegate had his pink and blue shirt cut and removed. A RIPP restraint was applied by an escort to the handcuffs and Applegate was escorted backwards to the cell door. Applegate's hands were secured through the food port I held Applegate's right hand while the handcuffs were removed and Applegate was secured in his cell without any further issue.

ECF 22 at 16.

Finally, Lopez Mendoza's report states:

> Just before getting into 4F15 cell, Applegate refused to respond when asked if he was going to cooperate with the process of a strip search. Once in the cell, Applegate was asked again, and again refused to give an answer. He began to give resistance and push back in towards myself and the other escort. Due to his extensive assault on staff history, it was agreed on that the safest way to complete this process was to use the jail safety cutter to remove his clothes.
>
> I assisted Applegate by grabbing his arm and guiding him to a prone position on his stomach. The escorts who were controlling his lower body worked together to remove his shoes, socks, pants, and boxers. While standing on the left side of Applegate, I received the cutters and kneeled down to cut his shirts. I started by cutting the sleeves along the seams and then made another cut down the middle. This allowed all the shirts to be removed from under his body. I handed the cutters to another staff member for safety. At this point, I found it reasonable to attach my ripp restraint to the handcuffs to remove them through the cell door's food port. Applegate was assisted off the floor and walked back towards the door. As I exited the cell, I handed the ripp restraint to

PAGE 5 – OPINION AND ORDER

> another deputy to control. I disengaged from the scene while others removed the handcuffs from Applegate. The food port was closed with no issues, and Applegate was later seen by medical. No injuries were reported.

*Id.* at 13-14. No party provides evidence of how long Plaintiff was left naked in his cell. Between three and four hours after this encounter, MCSO Nurse Margaret Rogers evaluated Plaintiff and his injuries. *Id.* at 18. In her report, she wrote that Plaintiff "reports he was hit in the head pointing to the L side of cheek." *Id.* She concluded that there was "[n]o swelling, bruising or redness of area of reported injury." *Id.* She did, however, prescribe him a week's worth of optional pain medication. *Id.*

Plaintiff alleges that Defendants' conduct during this strip search violated the Eighth Amendment. Plaintiff seeks $15,000 in damages.

**B. Defendants' Policies**

Defendants submit segments of the MCSO 2017 Corrections Division Operational Policy and Procedures Manual ("Policy and Procedures Manual") and MCSO's Agency Manual ("Agency Manual"). The Policy and Procedures Manual outlines circumstances under which prison staff may use force and how a use of force must be reported. *See, e.g.*, ECF 30 at 5-7. The Agency Manual similarly outlines rules for using force and the factors used to determine reasonableness of force. *See, e.g.*, *id.* at 18-19. MCSO Sergeant Brandon Pedro further provides that "[w]hen transferring an adult in custody into a disciplinary housing cell, it is standard practice for MCSO deputies to conduct a strip search prior to providing the adult in custody with new, disciplinary housing-specific clothing." Decl. of Brandon Pedro ¶ 5 (ECF 30).

## DISCUSSION

Defendants make two arguments in support of summary judgment. First, Defendants argue that no reasonable juror could find that Defendants used excessive force on Plaintiff.

PAGE 6 – OPINION AND ORDER

Second, even if there is a dispute of fact on whether the force used was reasonable, Defendants argue that they are entitled to qualified immunity.

**A. Constitutional Claims Brought by Pretrial Detainees**

Plaintiff alleges a claim of excessive force, in violation of the Eighth Amendment. The Eighth Amendment, however, applies only to convicted individuals. *See Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (applying *Ingraham* to hold that "[b]ecause there had been no formal adjudication of guilt against" a person at the time that he was injured by the police, "the Eighth Amendment has no application"). Because Plaintiff had not been convicted at the time that he was strip searched, his claim cannot move forward under the Eighth Amendment.

"Where the State seeks to impose punishment without . . . an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Ingraham*, 430 U.S. at 671 n.40; *see also Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979) ("The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees."); *Norbert v. City and County of San Francisco*, 10 F.4th 918, 928 (9th Cir. 2021) (noting that the claims of pretrial detainees "are analyzed under the Fourteenth Amendment Due Process Clause, rather than under the Eighth Amendment" (quotation marks omitted)). The appropriate framework by which to evaluate a pretrial detainee's due process rights depends on the type of allegation. Failure-to-protect claims—when plaintiffs sue prison officials for injuries caused by other prisoners or prison conditions—trigger a "deliberate indifference" inquiry analogous to a traditional Eighth Amendment analysis. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1067-68 (9th

PAGE 7 – OPINION AND ORDER

Cir. 2016); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). By contrast, Fourth Amendment standards of reasonableness govern excessive force claims such as Plaintiff's.[4] *See Lolli v. County of Orange*, 351 F.3d 410, 415 (9th Cir. 2003) ("[T]he Fourth Amendment sets the applicable constitutional limitations for considering claims of excessive force during pretrial detention."); *Dunham v. County of Monterey*, 2020 WL 9395224, at *1 (N.D. Cal. Apr. 29, 2020) (applying Fourth Amendment excessive force standards); *Warren v. County of Riverside*, 2021 WL 4594777, at *7 (C.D. Cal. Mar. 26, 2021) (same). Acknowledging that Plaintiff is unrepresented, the Court will construe Plaintiff's claim as alleging a violation of the Fourteenth Amendment and evaluate it under the appropriate Fourth Amendment framework.

## B. The Doctrine of Excessive Force under the Fourth Amendment

"Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000); *see also Kingsley*, 576 U.S. at 397 ("[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one."); *Holmes v. County of Orange*, 2017 WL 11632298, at *2 (C.D. Cal. Aug. 17, 2017) ("Because *Graham* requires an objective inquiry,

---

[4] In 2015, the Supreme Court decided *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). The Court held that to succeed on a § 1983 claim brought under the Fourteenth Amendment Due Process Clause, a pretrial detainee "must show only that the force purposely or knowingly used against him was *objectively unreasonable*" to prevail on an excessive force claim. *Id.* at 396-97 (emphasis added). In explaining what "objectively unreasonable" means, the Court relied heavily on *Graham v. Connor*, 490 U.S. 386 (1989), a case that dealt with the meaning of that phrase within the context of the Fourth Amendment. The *Kingsley* Court, however, did not *expressly* state that a proper Fourteenth Amendment excessive force analysis is identical to *Graham*'s Fourth Amendment excessive force analysis. Nevertheless, following the approach in *Kingsley* and in Ninth Circuit cases deciding claims of pretrial detainees under the Fourteenth Amendment, this Court will apply the Fourth Amendment excessive force framework outlined in *Graham*, because the analysis will be the same.

an officer's intentions—good or ill—have no bearing on whether he employed excessive force." (citing *Graham*, 490 U.S. at 397)).

"Objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Hyde v. City of Wilcox,* 23 F.4th 863, 870 (9th Cir. 2022) (quoting *Kingsley*, 576 U.S. at 397). Courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quotation marks omitted). Thus, the Court first "assess[es] the gravity of the particular intrusion on Fourth Amendment interests," then "assess[es] the importance of the government interests at stake," and finally, "balances[s] the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quotation marks omitted). "Although on summary judgment we view the evidence in the light most favorable to [the nonmovant], the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (cleaned up).

As summarized above, the parties present dramatically different recitations of the incident.[5] Plaintiff reports that Baines punched Plaintiff on the left side of his face six times and

---

[5] The Court acknowledges that the record in this case is bare; all that is before the Court is Plaintiff's account of events, Defendants' account of events, and a nurse's two sentence evaluation. Resolving this factual dispute would thus require the Court to make a credibility determination as to whose version of events should be believed. This task is better presented to a jury than a judge. *See Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) ("Because questions of reasonableness are not well-suited to precise legal determinations, the propriety of a particular use of force is generally an issue for the jury."); *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1107 (D. Or. 2013) ("Indeed, because the reasonableness of the use of force is necessarily fact-specific, it is often a question that cannot be resolved at summary judgment."); *see also Brown v. Grinder*, 2019 WL 280296, at *10 (E.D. Cal. Jan. 22, 2019) ("[i]t is for the trier of fact,

that Lopez Mendoza slapped Plaintiff on the right side of his face. Baines, by contrast, states in his narrative that he merely "placed" his hand (on the *right* side of Applegate's face) and was "holding" Plaintiff's head against the mattress to prevent movement. Neither of Defendants' narratives mention punches or a slap. Plaintiff states that after the encounter, he was left naked in his cell. Neither defendant states whether they left Plaintiff naked or provided him with clothes. Given these factual discrepancies, the Court construes the evidence in a light most favorable to the nonmovant. If, even under Plaintiff's recitation of the facts, Defendants' conduct would not amount to an excessive use of force, then Defendants are entitled to summary judgment.

### 1. Gravity of the Intrusion

The first step of the *Graham* analysis assesses the nature and quality of the intrusion on Fourth Amendment interests. *Graham*, 490 U.S. at 396; *Mattos v. Agarno*, 661 F.3d 433, 441 (9th Cir. 2011). Courts in the Ninth Circuit classify closed fist strikes[6]—or punches—as examples of significant intermediate uses of force.[7] *See Garlick v. County of Kern*, 167 F.

---

not this court, to determine the level of resistance posed by [the plaintiff's] movements and the level of resistance the defendant officers reasonably perceived through those movements.").

[6] A court has held that several open-palm strikes to the back of an individual's head could also constitute intermediate force because they were so forceful that the individual lost consciousness. *See Carmona-Perez v. City of Salem*, 2023 WL 6216167, at *8 (D. Or. Sept. 25, 2023). The Court declines to find, however, that a single slap that did not cause the recipient to lose consciousness would constitute significant intermediate force.

[7] Defendants note that when Corrections Health evaluated Plaintiff after the incident, Corrections Health reported "[n]o swelling, bruising, or redness of area of reported injury." Courts may consider the severity of injuries in evaluating the amount of force used. *See Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) (inferring from the minor nature of a plaintiff's injuries that the force applied was minimal). Although she found no swelling, bruising, or redness on Plaintiff's left cheek, Nurse Rogers still prescribed optional pain medication. Moreover, the check-up occurred more than three hours after the encounter, meaning that certain potential symptoms of injuries—such as redness—may have subsided before the appointment. Therefore, the Court does not read Nurse Rogers's report to conclusively undermine Plaintiff's allegations of injury in his verified complaint.

PAGE 10 – OPINION AND ORDER

Supp. 3d 1117, 1147 (E.D. Cal. 2016) ("[I]mpact blows by punching or kicking are considered 'significant force.'"); *Aranda*, 942 F. Supp. 2d at 1105 (finding that closed fist and knee strikes to an individual's head is a "significant" use of force); *Zawacky v. Clark County*, 2024 WL 2133956, at *4 (W.D. Wash. May 10, 2024) ("Impact blows, such as face punches . . . are generally considered significant intermediate force.") (quotation marks omitted). Intermediate force is "the most severe force authorized short of deadly force," *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005), and "must be justified by a commensurately serious state interest," *Young*, 655 F.3d at 1163.

Pretrial detainees in institutional settings may be subjected to strip searches if they are conducted in a *reasonable* manner. *See Dolan v. Clawson*, 2023 WL 4627680, at *4 (D. Alaska July 13, 2023). Moreover, some pretrial detainees may be deprived of certain types of clothing—or clothing altogether—for certain amounts of time based on their circumstances. *See, e.g.*, *Moret v. Millsap*, 2021 WL 4786834, at *4 (D. Or. July 26, 2021) (finding that staff had a legitimate reason to deprive a suicidal adult in custody of regular-issue clothing because torn clothing can present safety risks), *report and recommendation adopted*, 2021 WL 4786470 (D. Or. Oct. 13, 2021). What Ninth Circuit jurisprudence does not support, however, is the practice of leaving an adult in custody naked purely as part of a show of force after that adult has been restrained or subdued. Forcing an individual to remain naked, even for non-extensive periods of time, can severely impinge on that person's dignity, even if it does not result in a physical injury. *See Vazquez v. County of Kern*, 949 F.3d 1153, 1165 (9th Cir. 2020) (explaining that in the Ninth Circuit, "it is clearly established that the Fourteenth Amendment protects a sphere of privacy, and the most basic subject of privacy [is] the naked body" (cleaned up)); *Doe v. County of Orange*, 2022 WL 18776166, at *20 (C.D. Cal. Dec. 16, 2022) (explaining that although privacy

PAGE 11 – OPINION AND ORDER

is necessarily curtailed during detention or incarceration, the naked body is "the most basic subject of privacy" as protected by the Fourteenth Amendment).

### 2. Government's Interest

Moving to the second step of the *Graham* analysis, the Court evaluates the government's interest by assessing the "core factors": (a) the severity of the crime; (b) whether the suspect posed an immediate threat to the officers' or public's safety; and (c) whether the suspect was "actively resisting." *Graham*, 490 U.S. at 396. These core factors are not exclusive, and the Court looks to the totality of the circumstances. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010); *Luchtel*, 623 F.3d at 980 (explaining that courts must consider, "under the totality of the circumstances, the 'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state" (citations omitted)). The Ninth Circuit has stated, however, that "the most important single element of the three [*Graham*] factors" is whether the suspect posed an immediate threat to the safety of the officer or others. *Chew*, 27 F.3d at 1441.

First, the Court considers the severity of Plaintiff's conduct that resulted in Defendants' use of force. According to Lopez Mendoza's narrative, Plaintiff "refused to respond" when asked to cooperate with the strip search, and then "began to give resistance and push back in towards [Lopez Mendoza] and the other escort." Baines states that after the escorts "helped" Plaintiff to a prone position on the mattress, "Applegate turned his head and inched towards my hand attempting to bite me." Plaintiff does not dispute in his complaint that he initially resisted the search in these ways.

PAGE 12 – OPINION AND ORDER

The second core factor is whether Plaintiff posed an immediate threat to the officers' safety.[8] The same factual disputes exist again with respect to whether Plaintiff posed a threat to the officers' safety that would justify six punches and a slap. Viewing the evidence in the light most favorable to Plaintiff, at the time of the alleged force he posed little or no threat to the officers. He was not armed, was outnumbered five to one, was held down on the floor (or mattress), and was already handcuffed by the time Defendants allegedly punched and slapped him. Because of the parties' factual disputes as to officer safety, the Court finds a genuine issue for trial on whether Plaintiff posed a considerable "immediate threat" that would justify intermediate force. *See Brown*, 2019 WL 280296, at *11 ("The disputes of material fact as to officer safety preclude the court's finding plaintiff posed a threat to anyone's safety sufficient to justify the force used by defendants."); *Mattos*, 661 F.3d at 444 (concluding that a driver did not pose an immediate safety threat because although she could have attempted to drive away "rapidly and recklessly," the officers confiscated her keys—thus terminating her means of escape—*before* tasing her).

Third, the Court considers whether Plaintiff was "actively resisting." "Resistance that is not 'particularly bellicose' does not support the use of intermediate force." *Zawacky*, 2024 WL 2133956, at *5 (quoting *Smith*, 394 F.3d at 703). Plaintiff does not challenge Defendants' narratives that Plaintiff ignored officer instructions, pushed against officers, or moved his head to bite Baines. Thus, even if Plaintiff did resist the strip search in the ways that Defendants claim, that resistance was brief and ceased when the officers pinned Plaintiff down. *Cf. Smith*, 394 F.3d at 703 (intermediate force was inappropriate where plaintiff ignored officers' commands and

---

[8] Given that at the time of the encounter, Plaintiff was an adult in custody inside a detention facility, the Court does not find that his conduct posed any public safety concern.

briefly physically resisted arrest). Furthermore, Plaintiff was physically restrained at the point when Defendants punched him, stripped him, and ultimately left him naked in his cell.

An additional factor that courts may consider in a *Graham* analysis "is the availability of alternative methods of capturing or subduing a suspect." *Id.*; *see also Aranda*, 942 F. Supp. 2d at 1106. In this case, an alternative method of subduing Plaintiff was available, as evidenced by how Defendants describe the encounter. Baines states that he needed only to "hold" Plaintiff's head against the mattress and "place" his hand on Plaintiff's cheek and forehead. Lopez Mendoza claims that he only "guid[ed]" Plaintiff to the ground. Plaintiff was unarmed, outnumbered, and handcuffed by the time Baines allegedly punched him. And it was after Defendants restrained Plaintiff that they conducted the strip search and *left* Plaintiff naked. If Plaintiff already was subdued before the strip search, leaving Plaintiff naked was not a necessary element of subduing him. Viewing the evidence in the light most favorable to Plaintiff and accepting his version of events, then Defendants' version of events would be a reasonable alternative method of conducting the strip search. A reasonable jury could thus find that Defendants had less forceful methods of subduing Plaintiff.

Finally, "a court must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Kingsley*, 576 U.S. at 399-400.[9] The Court notes that both officers adapted their behavior based on the Plaintiff's

---

[9] Defendants argue that the Court must consider whether Defendants acted "maliciously and sadistically to cause harm," citing *Wood v. Beauclair*, 692 F.3d 1041, 1049-50 (9th Cir. 2012). The Ninth Circuit in *Wood*, however, was analyzing the *subjective* prong of *Eighth Amendment* jurisprudence. As the Supreme Court has concluded, that standard does not apply in excessive force claims under the Fourteenth Amendment. *Kingsley*, 576 U.S. at 400-02 (rejecting argument that under the Fourteenth Amendment "the plaintiff must prove that the use of force

PAGE 14 – OPINION AND ORDER

apparent history of assaulting prison staff.[10] The Court also notes that strip searching is "standard practice" for MCSO deputies when transferring adults in custody to disciplinary housing. That does not, however, justify objectively unreasonable force in carrying out the strip search. Indeed, the Agency Manual explicitly states that staff shall "only use the amount of force that they reasonably believe appears necessary to *effectively control an incident*." ECF 30 at 15 (emphasis added). Further, the Court finds no provision in either the Policy and Procedures Manual or the Agency Manual that authorizes leaving an adult custody naked in his cell as punishment *after* an encounter requiring force has ended.

### 3. Balancing Intrusion Against Interests

Balancing the significant intrusion of Plaintiff's Fourth Amendment interests against the government's need for that intrusion weighs in favor of Plaintiff. As discussed, viewing the facts in a light most favorable to the nonmovant, the degree of force used against Plaintiff while he was restrained, unarmed, and outnumbered—six punches and a slap to the head, and being left naked in his cell—was significant, and the government interests at stake did not justify that level of force. Of course, the Court must also consider the perspective of a reasonable officer in Defendants' shoes at the time of the incident. *See Aranda*, 942 F. Supp. 2d at 1105. The Court understands that Plaintiff may have had a history of violence against facility staff that would have led the officers to fear a similar outcome during the transfer. The Court, however, finds a

---

was not 'applied in a good-faith effort to maintain or restore discipline' but, rather, was applied 'maliciously and sadistically to cause harm'").

[10] Baines states that he gathered multiple deputies to move Plaintiff from 4C to 4F because of Plaintiff's "history of staff assaults" and to "help mitigate any issues that could arise and ultimately prevent injury to staff or Applegate." Similarly, Lopez Mendoza notes that he used the jail safety cutter to remove Plaintiff's clothes because "[d]ue to [Plaintiff's] extensive assault on staff history, it was agreed on that [this method] was the safest way to complete this process."

PAGE 15 – OPINION AND ORDER

genuine issue for trial on whether it was reasonable for Defendants to believe that punching, slapping, and leaving Plaintiff naked *after he was subdued* were all actions justified by a commensurately serious state interest.[11]

## C. Defendants' Qualified Immunity Defense

"Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts. And reasonableness of official action, in turn, must be assessed in light of the legal rules that were clearly established at the time the action was taken." *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (cleaned up). Thus,

> [d]etermining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case.

*Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). But "[w]here the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate" *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003).

As discussed in the preceding section, the Court finds that, taken in the light most favorable to the party asserting injury, the record shows that Defendants' conduct amounted to an unconstitutional use of force. To determine whether a government official's conduct violates clearly established law, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Abassi*, 582 U.S.

---

[11] For example, there were at least three other officers in the cell who could have assisted in holding Plaintiff down to prevent him from resisting. Defendants could have also provided Plaintiff with verbal warnings before resorting to physical force.

PAGE 16 – OPINION AND ORDER

at 152 (quotation marks omitted). To be clearly established, "[i]t is not necessary . . . that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point. But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent." *Id.* at 151. (cleaned up). Thus, the key inquiry in determining whether an officer has qualified immunity is whether the officer had "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). *see also Saucier*, 533 U.S. at 202 (noting that the law need not be a "precise formulation of the standard" as long as "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand"); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) ("Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" (quoting *Bull v. City & County of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (en banc)). Courts must avoid the "danger of a rigid, overreliance on factual similarity." *Hope*, 536 U.S. at 742-43 (concluding that reasonable officers received fair warning from the "reasoning" of a case "though not the holding," even though "the facts of the case are not identical").

A court in this circuit first looks to binding precedent from the Supreme Court or the Ninth Circuit. *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). "[I]n the absence of binding precedent, [courts] look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Id.* (quotation marks omitted).

Plaintiff's altercation with Defendants occurred on August 27, 2023. There were several cases that put Defendants on notice that their alleged actions were unlawful. As noted above,

*Vazquez* stated that protections for the naked body were "clearly established" by 2020. 949 F.3d at 1165. Many cases put Defendants, such as the following, on notice that punching a person who was pinned down or handcuffed was unlawful.

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007), sufficiently put Defendants on notice that the use of intermediate force under the circumstances was excessive. In *Blankenhorn*, officers arrested Gary Blankenhorn for trespassing outside of a shopping mall. *Id.* at 468-69. Video footage showed three officers jumping on Blankenhorn; a brief struggle ensued. *Id.* at 469. Blankenhorn alleged that during the struggle, one of the officers punched him several times—including in the head—even after Blankenhorn was already on the ground. *Id.* at 469-70. The officer claimed he punched Blankenhorn in order to get his arms out from underneath him and secure handcuffs. *Id.* at 470, 480. Blankenhorn claimed that the officers never pinned his arms underneath his body. *Id.* at 480. Crediting Blankenhorn's version of events, the Ninth Circuit concluded that "a rational jury could find that if Blankenhorn did not maneuver his arms beneath his body it eliminated the need for any use of force to release them, and thus that [the officer's] punches were not reasonably justified by the circumstances as he claims." *Id.* The Ninth Circuit further explained that under *Graham*, "force is only justified when there is a need for force," and concluded that this "clear principle" would have "adequately put a reasonable officer on notice" that punching Blankenhorn to free his arms when he was not moving his arms to avoid arrest was a Fourth Amendment violation. *Id.* at 481.

The Court recognizes that *Blankenhorn* involved an arrest, whereas Plaintiff's incident occurred in pretrial detention. But that fact did not underlie the Ninth Circuit's analysis on this claim; rather, "[t]he court ultimately held that the justification for the punches turned on whether they were *necessary* to 'take control' of the suspect so he could be handcuffed." *Andrich v.*

PAGE 18 – OPINION AND ORDER

*Kostas*, 2022 WL 2905043, at *12 (D. Ariz. July 22, 2022) (emphasis added) (quoting *Blankenhorn*, 485 F.3d at 480). Construing the record in a light most favorable to Plaintiff, he was on the ground and handcuffed before he was punched and left naked. In other words, the officers already had control of Plaintiff before they used force. The Court thus finds that *Blankenhorn* clearly established that once officers have subdued an individual, force is no longer justified.[12] *Cf. Carmona-Perez v. City of Salem*, 2023 WL 6216167, at *11 (D. Or. Sept. 25, 2023) (finding that *Blankenhorn* "squarely governs" whether officers who pin an individual down and "palm strike" him are entitled to qualified immunity).

The Ninth Circuit again held that officer's conduct violated clearly established law where the officer pushed a handcuffed man into a wall multiple times, threw him to the ground, and punched him in the face while he was on the ground. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1052, 1057 (9th Cir. 2007). The Ninth Circuit explained that any reasonable officer should have known that this was an excessive use of force. *Id.* at 1057. Notably, the Ninth Circuit repeatedly has emphasized the importance of stopping the use of force after a person "surrenders and is rendered helpless." *LaLonde*, 204 F.3d at 961; *see also Watkins v. City of Oakland*, 145 F.3d 1087, 1090 (9th Cir. 1998).

Additionally, several district courts have held similar conduct as Plaintiff alleges Defendants engaged in to be clearly established as unconstitutional. *See, e.g.*, *Contreras v. City of Nogales*, 2022 WL 22885295, at *6, *9 (D. Ariz. Sept. 8, 2022) (rejecting qualified immunity when the plaintiff alleged that officers tackled the plaintiff while he was fleeing, hit him in the head, and tased him); *Sants v. Seipert*, 2021 WL 465292, at *5-6 (E.D. Cal. Feb. 9, 2021)

---

[12] The Ninth Circuit has also "clearly recognized a Fourteenth Amendment right to bodily privacy," even within the context of prisons. *Vazquez*, 949 F.3d at 1165.

(rejecting claim for qualified immunity because "any reasonable officer in Officer Seipert's position would have known that repeatedly striking Mr. Sants in the head would be an excessive use of force"); *Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 1003, 1015 (C.D. Cal. 2019) (rejecting qualified immunity for officers who punched in the head, tased, and kneeled on a suspect who had fled and was crawling out from underneath a bus to surrender at the time of the encounter). Given all of the clearly established caselaw, the Court rejects Defendants' summary judgment motion based on qualified immunity.

## CONCLUSION

The Court DENIES Defendants' motion for summary judgment (ECF 20).

**IT IS SO ORDERED**.

DATED this 4th day of February, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge